# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHAEL STAMPLEY,

    Plaintiff,

v.

ALTOM TRANSPORT, INC.,

    Defendant.

No. 14 CV 3747

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Stampley leased his truck and services to defendant Altom Transport, Inc., a motor-carrier company, in exchange for "70% [of] gross." Customers hired Altom to transport chemicals by truck, and these shipments often required that the tanks be washed after delivering the chemicals to their recipient. Customers paid for the cleanings, but Altom did not include these payments as part of "gross" when it calculated Stampley's compensation. Stampley thinks he should have received 70% of that money, and brought claims for breach of contract, unjust enrichment, and a violation of the federal Motor Carrier Act and its regulations. Altom disagrees and says the tank-wash payments were simply expense reimbursements unrelated to Stampley's services and therefore not part of "gross." Altom now moves for summary judgment on plaintiff's claims. For the following reasons, the motion is denied.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When the material facts are not in dispute, the existence and interpretation of a contract are questions of law that the court may decide on a motion for summary judgment." *Citadel Group Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587 (7th Cir. 2012). A court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 964 (7th Cir. 2013).

## II. Facts

Plaintiff Michael Stampley, the owner and operator of a truck, entered into an Independent Contractor Agreement with defendant Altom Transport, Inc., a for-hire motor-carrier company. [123] ¶¶ 1–2, 10.[1] Under the contract, Stampley hauled

---

[1] Bracketed numbers refer to entries on the district court docket, and referenced page numbers are from the CM/ECF header placed at the top of filings. The facts are largely taken from Stampley's response to Altom's LR 56.1 statement, [123], and Altom's response to Stampley's LR 56.1 statement, [130]. Stampley says that Altom violated LR 56.1 by including immaterial facts, statements unsupported by admissible evidence, misleading statements, inaccurate citations, combined statement of facts, and legal arguments and

shipments for Altom from September 28, 2012, through sometime in March 2014. [123] ¶ 11. The contract states that Stampley "shall provide [Altom] transportation related services and the use of the equipment set forth below or in an appendix." [123] ¶ 17; [113-8] at 2. And it specifies that "equipment" refers to Stampley's truck. [123] ¶¶ 18, 24. Stampley had the right to accept or refuse shipping jobs that Altom offered him without penalty, and he was free to choose his routes when he did accept one. [123] ¶ 28. Altom often shipped oils and chemicals for its customers. [123] ¶ 3. That meant that, after unloading a shipment at the customer's location, Stampley had to get the inside of the trailer washed to avoid contaminating the next shipment. [123] ¶ 5; [130] ¶¶ 17–18. This involved driving the empty trailer, or "tank," to a tank-wash facility, sometimes participating in readying the tank for cleaning by lifting heavy hoses, and waiting at the facility while the tank was washed. [130] ¶¶ 17–23.

Stampley's compensation appears in Appendix A to the contract, which is based on a standard form provided by the Illinois Commerce Commission. [123] ¶¶ 22–23. According to that document, Stampley was to be compensated in an amount equal to "70% [of] gross." [123] ¶ 25. Section 9B of the contract provided that "[w]here payment is predicated upon a percentage of gross revenues, [Altom]

---

conclusions. Stampley requests that summary judgment be denied on this basis alone. That request is denied. Altom, in turn, complains that Stampley's statement of facts and his attached affidavit are immaterial and irrelevant. Altom argues that the affidavit is self-serving, and that the statements therein are irrelevant, but does not dispute those statements or suggest that they conflict with his deposition testimony. Only those facts which are properly controverted will be considered disputed. Also, any arguments raised in the LR 56.1 statements and any statements that are unsupported by admissible evidence (or where a party fails to follow LR 56.1's direction to cite to supporting material in the record) will be disregarded.

shall present [Stampley] with copies of rated freight bills, or a computer-generated document containing all of the same information, for all shipments transported in or with Equipment leased pursuant to the [Agreement]." [123] ¶ 26.[2]

Along with every paycheck, Altom would send Stampley a document itemizing the shipments he made, their delivery dates and locations, the amount invoiced to the customer for freight, the 70% share of that amount paid to Stampley, and additional payments for fuel, loading, unloading, tolls, weigh fees, and other items. [123] ¶ 29. But those information sheets did not include the amount invoiced to the customer for the tank wash. [130] ¶¶ 1, 3. In fact, throughout his tenure with Altom, Stampley did not know that Altom received money from customers for tank washes that was excluded from the information sheets and his compensation. [130] ¶ 27. Stampley believes he is entitled, under the contract, to 70% of the money that Altom received from its customers. [123] ¶ 38.

## III. Analysis

Under Illinois law,[3] contracts are construed to effectuate the intent of the parties. *Gallagher v. Lenart*, 226 Ill.2d 208, 232 (2007) (citations omitted). A court

---

[2] The contract also provides that Stampley has thirty days from receipt to contest the payment information provided. [123] ¶ 27. Stampley makes a number of arguments as to why that provision either does not apply or is unenforceable. *See* [122] at 13–17. In its reply, Altom does not respond to Stampley's arguments, but says instead that it does not move for summary judgment on the basis of that provision. [129] at 12. I agree with Altom that the thirty-day provision is irrelevant to the pending motion, and I do not reach any of Stampley's arguments concerning it.

[3] That Illinois law governs the contract has already been established in this action. *See* [100] at 8 n.3. But Stampley states in his response brief that federal common law and general contract principles apply instead. [122] at 8. There is no authority in this circuit supporting federal preemption in interpreting the terms of a contract concerning motor-

4

first looks solely at the contract's language, since it is the best indication of the parties' intent. *Id*. (citations omitted). The contract must be examined "as a whole, viewing each part in light of the others." *Id*. (citations omitted).

The Illinois "four corners" rule provides a threshold inquiry, which asks whether the contract is ambiguous. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). A contract is ambiguous "only if the language used is reasonably or fairly susceptible to having more than one meaning." *Flora Bank & Trust v. Czyzewski*, 222 Ill.App.3d 382, 388 (5th Dist. 1991) (internal citations omitted). A contract is not ambiguous, however, "if a court can discover its meaning simply through knowledge of those facts which give it meaning as gleaned from the general language of the contract." *Id*. That the parties disagree as to the meaning of a contract's terms does not render the contract "ambiguous" under this rule. *Id.*

The contract says Stampley is to be paid "70% [of] gross." [123] ¶ 25. The parties agree that the word "gross" refers to gross revenue, and they seem to agree that gross revenue is limited to each invoiced shipment in which Stampley was involved—Stampley does not seek a percentage of Altom's gross revenues on a company-wide basis, nor does he seek a percentage for any shipments involving other drivers or trucks. The parties dispute whether they further limited the term. Altom argues that "gross" is further limited to the revenue attributable to Stampley's services in hauling shipments with his truck, and that tank washes are unrelated to those services. Stampley believes "gross" refers to all of the money paid

---

carrier leases. *See, e.g., Walker v. Trailer Transit, Inc.*, 824 F.3d 688, 689 (7th Cir. 2016) (applying state law in interpreting similar lease).

by customers in relation to each shipment he made, including tank-wash payments. Both parties have argued that the contract is unambiguous, and each party thinks its own interpretation is the only reasonable one.[4] "Both can be wrong, but both cannot be right." *Bourke*, 159 F.3d at 1037. The first step is to determine whether Altom's interpretation of the agreement is reasonable.

Altom focuses its argument on the context of the contract and the regulatory framework that governs leases in the trucking industry—the Motor Carrier Act and its implementing regulations. *See* 49 U.S.C. § 14102; 49 C.F.R. § 376.1 *et seq*. Altom notes that the contract is a lease of Stampley's "transportation related services" and the use of his truck. [113-8] at 2. The lease provision that defines Stampley's compensation as a percentage of "gross" appears on an Illinois Commerce Commission form, titled "Equipment Lease Motorized (Power) Units Only"—also referring to his truck. [113-8] at 23. And Section 9(b) of the contract, in discussing Stampley's percentage-based compensation, refers to "all shipments transported in or with Equipment leased pursuant to this Agreement." [113-8] at 11. Altom believes the contract's references to Stampley's services, his equipment, and shipments indicate that Stampley's compensation is limited to 70% of gross revenue derived from Stampley's services in hauling shipments with his truck, and that the tank-wash payments are separate.

---

[4] The parties also accuse each other of switching positions and calling the contract ambiguous. But these arguments are unsupported and will not be considered. Further, their consideration would not change the outcome of this motion.

Altom also argues that the contract mirrors the governing regulations, and that those regulations provide additional context. For example, the regulation governing compensation provisions in this type of lease refers to "equipment and driver's services." 49 C.F.R. § 376.12(d). That regulation permits driver compensation to be expressed as "a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease." 49 C.F.R. § 376.12(d). Another subsection refers to compensation "based on a percentage of the gross revenue for a shipment." 49 C.F.R. § 376.12(g). When viewed in conjunction with the rest of the contract and with the regulatory framework in mind, Altom argues, the term "gross" is limited to Stampley's hauling of shipments with his truck. And because the tanks were washed after the shipments were delivered and Stampley did not wash the tanks himself, Altom believes it does not owe him any of the money paid for that service.

The problem with Altom's argument is that it does not point to any contractual term that defines the scope of Stampley's services under the contract in enough detail to exclude the tank washes from those services. The contract and the regulations do overlap in language, but none of the cited provisions aid in interpreting "gross" or Stampley's services under the contract. Altom shows that Stampley's obligations and benefits under the contract relate in some way to his transportation-related services, shipments, and the use of his truck, but Altom does

not cite to anything that supports its contention that the tank-wash payments are unrelated to those things or otherwise outside the scope of Stampley's contract.[5]

The case law Altom cites does not help, either. Altom invokes *Knorr v. White Bros. Trucking Co.*, 79 Ill.App.2d 471 (2nd Dist. 1967), a case involving multiple leases between a truck owner and a carrier. The court held that the leases contained an unwritten payment term with respect to one repeat customer whose shipments required specialized unloading equipment. *Id.* at 478–79. The court found the truck owner to be an unreliable witness and did not credit his testimony that he had no knowledge of the payment term, noting that other witnesses had testified that they had discussed the term with him several times. *Id.* at 478. Also, it reasoned that Knorr was an experienced trucker, and he maintained his own records which would have allowed him to verify his payment calculation. *Id.* The court found that the parties' conduct indicated that they had all agreed to the payment term, though it was not explicitly written into the contract. *Id.* at 477–79. Altom tries to draw a parallel to this case by explaining that Stampley is an experienced trucker and never questioned the deduction of the tank-wash payments. But that is where the parallels end. *Knorr* is inapplicable, not because it is an old case and predates the current industry regulations, as Stampley argues,

---

[5] The regulations do require that the lease "clearly specify the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portions of such items." 49 C.F.R. § 376.12(e). Presumably, Altom believes that tank washes are either "accessorial services" or are unlisted in the regulations. But neither party cites this language, and the contract does not identify tank washes as an accessorial service or exclude money received for tank washes or accessorial services from Stampley's compensation.

8

but because it relies on the principal that a contract's meaning may be revealed by the parties' conduct. *Id.; see also Weger v. Robinson Nash Motor Co.*, 340 Ill. 81, 91–92 (1930). Stampley may be an experienced trucker, but there is no evidence that the parties discussed withholding tank-wash payments from Stampley's compensation, and it is undisputed that he believed he was being paid 70% of the payments made by the customers. Further, his conduct was consistent with that belief. Altom is asking that an additional limitation on "gross" be read into the contract where none exists. That is not a reasonable interpretation of the contract.

Stampley's interpretation of "gross" is both reasonable and consistent with its commonly accepted usage. *See City of Dallas, Tex. v. F.C.C.*, 118 F.3d 393, 395 (5th Cir. 1997) ("The phrase 'gross revenue' has a generally accepted meaning: unless expressly limited by the terms of a statute, regulation or contract, gross revenues means all amounts received from operation of a business, without deduction."). A plain reading of the term, incorporating the parties' agreed limitation to the jobs Stampley worked on, includes all of the money collected from a customer in relation to each shipment, including the tank-wash payments. To some extent, that interpretation is also consistent with Altom's understanding of the term as being related to Stampley's shipping services, because the tank washes were a part of those services. Stampley admits that he did not wash the tanks himself, but says that he did perform services in connection with the tank washes. He had to drive the tanks to the tank-wash facilities, perform labor to ready the tanks for washing, and wait for the tanks to be washed. Altom says in its reply brief that "[i]t is

9

irrelevant what [Stampley] had to do in connection with the tank washes. He did not perform the cleanings and did not pay for them." [129] at 9. But Altom does not explain why Stampley's conduct would not fall under the categories of "transportation related services" or "use of [his truck]," which form the bases of the lease. Instead, Altom argues that Stampley was an independent contractor and could have refused, without penalty, any shipments for transportation that involved a tank wash. It is notable that Altom does not say Stampley could have delivered a shipment and refused to drive the tank to the wash facility. Altom's argument seems to be that it leased Stampley's driving services and truck, and that Stampley was obligated under the lease to both haul shipments for customers and drive the empty tanks to wash facilities, but that Stampley's compensation related only to hauling the shipments but not to driving the empty tanks. In its arguments, and in its practice, Altom treated each shipment and corresponding tank wash as one job. If both tasks were related enough to obligate Stampley to do both under the contract, they were related enough to justify paying him under the contract.

Altom's other argument is that Stampley's interpretation of "gross"—without limitation as to services provided—would be absurd. "Contractual language can be bent when necessary to avoid absurd or even just commercially unreasonable results." *In re Comdisco, Inc.*, 434 F.3d 963, 967 (7th Cir. 2006) (citing *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860 (7th Cir. 2002); *Merheb v. Illinois State Toll Highway Authority*, 267 F.3d 710, 713 (7th Cir. 2001); *Health Professionals, Ltd. v. Johnson*, 339 Ill.App.3d 1021, 1036 (3rd Dist. 2003)). Altom

10

compares the dueling interpretations here to those of the parties in *Beanstalk*, a case where a trademark broker and a manufacturer contracted to split gross receipts from licensing a trademark. *Beanstalk*, 283 F.3d at 858. When the manufacturer entered into a joint venture and effectively sold its business, the trademark broker relied on the literal terms of the contract to ask for a commission on that deal. *Id.* at 861. The court held that the deal was wholly outside the scope of the parties' contract and unrelated to the broker's services, and that a literal interpretation would yield absurd results. *Id.* at 860–61. Here, Stampley's interpretation of "gross" is not so absurd or unreasonable that the terms of the contract cannot be enforced as written. Hauling the shipments and washing the tanks are sufficiently related to bring both within the scope of the contract, particularly because Stampley did work related to both.

Altom also describes several hypothetical scenarios to highlight the absurdity it perceives in Stampley's interpretation. For example, it asks whether a lawyer who is to be paid 70% of gross revenue from a client would expect to receive 70% of the money received for travel, lodging, and other expenses that were passed on to the client at cost. It also asks whether Stampley would receive 70% of the cost of a hotel room if the customer required him to spend a night at a hotel and offered to pay for it. These hypotheticals are unpersuasive for two reasons. First, Altom's absurdity argument is premised on the characterization of the tank-wash payments as "reimbursements," but it has not established that the tank washes were passed

on to the customers at cost.[6] Second, and more importantly, they are not altogether absurd. Unless limited by statute or a separate term in the contract, gross revenue is calculated before the deduction of expenses. There is nothing inherent in payments for travel, lodging, or tank washes that makes their inclusion in a gross revenue figure absurd or even commercially unreasonable. Surely Altom incurs other expenses in running its business and facilitating shipments, and those expenses are paid for with revenue from its customers, 70% of which goes to Stampley. If Altom intended for the tank-wash payments to be excluded from the gross revenue calculation, its opportunity to say so was in the formation of the contract. Clearly, other carriers have made use of that opportunity. *See, e.g., Walker*, 824 F.3d 688 (discussing a lease between a trucker and a motor-carrier where payment term was a percentage of gross revenues excluding certain items and services). Altom provides no explanation for why it could not do the same.

Stampley's interpretation is reasonable, and Altom's interpretation is not. The term "gross" unambiguously refers to the money paid by the customer in relation to each shipment, including payments for tank washes. Summary judgment is therefore denied as to Stampley's breach of contract claim (Count II). Altom's only argument as to Count I and Count III is that the resolution of those claims hinges

---

[6] The parties dispute this. Altom claims that the tank washes were passed through to the customer at cost, but there is no evidence in the record to support that contention, or if the tank washes cost Altom anything at all. At his deposition, Altom's Executive Vice President Thomas Warren testified as to the amount of money paid to Altom by the customers for tank washes, *see* [113-5] at 20–21, Tr. at 20:19–21:22, but there is no evidence in the record as to the money, if any, paid by Altom to third parties. Ultimately, it does not matter whether the tank washes represented an opportunity for profit or reimbursement—the contract does not exclude them from "gross."

12

on the outcome of Count II. Accordingly, because summary judgment is denied as to Count II, it is denied as to Counts I and III, as well.[7]

## IV. Conclusion

Altom's motion for summary judgment on Stampley's claims, [111], is denied. A status hearing is set for 10/6/16 at 9:30 a.m.

ENTER:

                                                      Manish S. Shah
                                                      United States District Judge

Date: 9/15/2016

---

[7] Although not an argument raised by Altom in the pending motion, I note that the parties' relationship is governed by a contract, and "[w]here there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." *Guinn v. Hoskins Chevrolet*, 361 Ill.App.3d 575, 604 (1st Dist. 2005) (quoting *Nesby v. Country Mutual Ins. Co.*, 346 Ill.App.3d 564, 567 (5th Dist. 2004)).